# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

Irvin Morales

   v.             Case No. 23-cv-00522-SM-TSM

Helen Hanks, Commissioner,
New Hampshire Department of
Corrections, et al.

## REPORT AND RECOMMENDATION ON
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

   Pro se plaintiff Irvin Morales ("Morales") brings this action against four employees of the

New Hampshire Department of Corrections ("NHDOC"),[1] claiming that defendants violated his

First Amendment rights by placing him in segregation, transferring him to an NHDOC facility that

posed threats to his safety, and ultimately returning him to prison in New Jersey, where he was

originally incarcerated, in retaliation for filing two separate lawsuits challenging the conditions of

his confinement while in NHDOC custody.  Before the court is Plaintiff's Motion for Preliminary

Injunction (Doc. No. 2) in which Morales is seeking a preliminary injunction order:

> compelling Defendants to make every effort to return Plaintiff to the New
> Hampshire State Prison [("NHSP")], and prohibiting Defendants from interfering
> with Plaintiff's constitutional rights and/or from retaliating against Plaintiff for
> petitioning the court for relief, including but not limited to, preventing Defendants
> from transferring Plaintiff out of NHSP during the pendency of this action.

After consideration of the parties' written submissions, the evidence presented during an

evidentiary hearing held on July 10, 2024, and the parties' oral arguments, this court concludes

---

[1] Defendants include Helen Hanks, the New Hampshire Commissioner of Corrections during the
relevant time period; Michelle Edmark, the Warden of the New Hampshire State Prison for Men
("NHSP"); Sarah Provencher, the Deputy Warden of the NHSP during the relevant time period;
and James Azzara, the Chief of Investigations at the NHSP during the relevant time period.
Morales sued each of the defendants in both their individual and official capacities.

that Morales fails to show that he is likely to succeed on the merits of his claim against the defendants. Accordingly, and for all the reasons set forth herein, this court recommends that Morales' motion for a preliminary injunction be DENIED.

## BACKGROUND[2]

### *Morales' Transfer to New Hampshire*

Morales is a New Jersey inmate serving a sentence imposed by a New Jersey state court. Hearing Transcript (Doc. No. 31) ("Tr.") at 44. In or around July 2009, while Morales was incarcerated in New Jersey, he asked the New Jersey Department of Corrections ("NJDOC") for a transfer to New Hampshire, pursuant to the Interstate Corrections Compact ("ICC"), so he could be closer to, and receive visits from, his ailing mother and sister, both of whom reside in New Hampshire. See Compl. ¶ 14; Tr. at 9-10, 45. The ICC "is designed to permit cooperative use of facilities and programs by the Federal government and by the states which are parties to the Compact." Dozier v. Hilton, 507 F. Supp. 1299, 1308 (D.N.J. 1981). It allows "a prisoner convicted in one state, the 'sending' state, [to] be confined in another state, the 'receiving' state." Martin v. Warren, No. 12-4670 (AET), 2012 WL 3316830, at *1 (D.N.J. Aug. 13, 2012). Under the New Jersey regulations implementing the ICC, inmate interstate transfers may occur "at the request of an inmate (consensual), at the request of the [Commissioner of the NJDOC] (nonconsensual), or upon order of the Commissioner[.]" N.J. Admin. Code § 10A:10-3.6.

To obtain a transfer, Morales had to comply with the New Jersey requirements for processing consensual interstate transfers, a process requiring the completion and submission to

---

[2] The facts are derived from Morales' Civil Rights Complaint (Doc. No. 1) ("Compl."), as well as from the evidence presented during the July 10, 2024 evidentiary hearing. During the hearing, Morales testified in support of his motion for a preliminary injunction and Kelly Fosterling, the Interstate Deputy Compact Administrator for the NHDOC, testified on behalf of defendants.

the NJDOC of an Inmate Agreement of Waiver Regarding Interstate Transfer ("Inmate Waiver"). N.J. Admin. Code § 10A:10-3.7(i)(5).  The record establishes that Morales reviewed and signed an Inmate Waiver on July 24, 2009.  See Tr. at 45; Def. Ex. A.[3]  Therein, Morales agreed, inter alia, to a transfer from New Jersey to New Hampshire "under the terms of the [ICC.]"  Def. Ex. A.  He also acknowledged in relevant part as follows: "In further consideration of being granted the privilege of an interstate transfer, I agree that I will waive extradition, and I will return without protest to the State of New Jersey whenever such return is initiated by either State."  Id.  As detailed below, defendants argue, and Morales disputes, that plaintiff's agreement to return to New Jersey without protest compels the denial of his motion for a preliminary injunction.

New Jersey granted Morales' request for a transfer.  See Compl. ¶ 13; Tr. 45.  It then forwarded plaintiff's ICC documentation to the NHDOC for consideration.  Tr. 51-54.  Following its review of the materials, including the Inmate Waiver, the NHDOC agreed to take Morales into its custody.  See Tr. 45, 51-54.  New Jersey transferred Morales to New Hampshire in 2010.  Tr. 45, 48.  Plaintiff claims that he remained in NHDOC custody until November 2022, when he was picked up by officers from the NJDOC and transferred to a New Jersey prison.  See Compl. ¶¶ 36-37; Tr. 10-11, 34.  He further claims that defendants' decision to return him to New Jersey after more than a decade in New Hampshire was motivated by their desire to retaliate against him for filing and prosecuting two civil rights actions against the NHDOC and some of its employees.  Compl. ¶ 61; see also Tr. 23, 26-27.

---

[3] "Def. Ex. A" refers to a signed copy of Morales' Inmate Waiver, which was admitted into evidence as Defendant's Exhibit A during the June 10, 2024 evidentiary hearing.

### *Morales' Litigation Against the NHDOC*

Morales filed his two civil rights actions, <u>Morales v. Doe, et al.</u>, No. 17-cv-00234-SM (D.N.H) ("<u>Morales I</u>") and <u>Morales v. N.H. Dep't of Corr.</u>, No. 217-2022-cv-00425 (N.H. Super. Ct., Merrimack Cty.) ("<u>Morales II</u>"), during his incarceration in New Hampshire. <u>See</u> Compl. ¶¶ 15, 18. Both actions concerned plaintiff's conditions of confinement while in NHDOC custody. Specifically, in <u>Morales I</u>, which Morales filed on June 13, 2017, plaintiff claimed that NHDOC employees violated his constitutional rights in connection with a strip search. <u>Id.</u> ¶¶ 15-16; <u>see also</u> Tr.11.[4] In <u>Morales II</u>, which Morales filed on June 17, 2022, plaintiff claimed that NHSP personnel violated his rights by refusing to provide him with medical treatment after he was sprayed in the eyes with a caustic chemical that eventually damaged his eyes and his eyesight. Compl. ¶ 18; <u>see also</u> Tr. 30-31. Morales contends that he has "never been a problem" for the NHDOC other than the fact that he filed the two civil rights cases against them. Tr. 41.

### *Morales' Transfers Within the New Hampshire Prison System*

Plaintiff's claim for retaliation against the defendants involves a series of transfers that began in July 2022, when plaintiff was incarcerated at the NHSP, and concluded in November 2022, when Morales was transferred back to New Jersey. The initial transfer took place on July 31, 2022, a little over two months after plaintiff filed a motion to compel the production of documents in <u>Morales I</u> and about a month and a half after plaintiff initiated <u>Morales II</u>. <u>See</u> Compl. ¶¶ 17-19; Tr. 5. On that date, Morales was removed from his housing unit in the southern compound of the NHSP, placed on Pending Administrative Review ("PAR") status, and transferred to the facility's Secure Housing Unit ("SHU") for committing a "39-B" disciplinary

---

[4] A review of the docket in <u>Morales I</u> is sufficient to substantiate plaintiff's allegations with respect to that litigation. <u>See</u> Case No. 17-cv-00234-SM.

offense.  See Compl. ¶¶ 19-21; Tr. 5.  NHDOC Policy and Procedure Directive ("PPD") 5.25, defines a "39B" offense as a failure "to obey any written rule, posted notice or procedure of the institution or order of any staff member."[5]  PPD 5.25, Att. 1 at 3.  Morales was charged for being "unduly familiar" with prison staff after he gave a birthday card to a female staff member.  Compl. ¶ 20; Tr. 5.

Morales pleaded guilty to the disciplinary charge and received a sanction consisting of 25 days of lost privileges.  Tr. 5; Compl. ¶ 21.  Notably, however, he received no segregation time as part of his sanction.  Compl. ¶ 21; see also Tr. 5.  Thus, plaintiff claims that his confinement in the SHU was motivated, not by his conduct with respect to the female staff member, but instead by defendants' desire to retaliate against him for filing and prosecuting his civil rights claims against the NHDOC and its employees.  Compl. ¶ 61.

On or about August 10, 2022, ten days after the initial transfer, Morales was removed from SHU and sent to general population.  Tr. 5.  He remained there until August 12, 2022, when he was suddenly transferred to the closed custody unit ("CCU").  Tr. 5-7.  Upon his transfer to the CCU, Morales was told that the NHDOC was going to transfer him to the Northern New Hampshire Correctional Facility ("NNHCF") in Berlin, New Hampshire, although no one with whom Morales spoke could provide a reason for the transfer.  Tr. 6.  Plaintiff alleges that "NNHCF is a maximum-security prison which incarcerates the most dangerous inmates within New Hampshire."  Compl. ¶ 25.  The record indicates that the prospect of a transfer to the NNHCF raised significant concerns regarding Morales' safety.

---

[5] PPD 5.25 was in effect at the time Morales was charged with the disciplinary offense.  See Tr. 32.  It has since been replaced by an updated directive.  See Compl. ¶ 21.

Specifically, the record shows that in January 2022, three fellow prisoners assaulted Morales and almost killed him by causing a brain bleed.  Tr. 6, 15.  After those prisoners were caught, two of them were transferred to Berlin.  Tr. 14.  Morales feared he might suffer serious harm if he encountered those individuals at the NNHCF.  See id.  The record also shows that Morales was housed at the NNHCF from 2010 to 2013.  Tr. 10.  During that time, he assisted prison officials in investigating drug problems at the facility and provided them with information regarding the movement of drugs into the prison by members of a gang.  Tr. 10, 14-15.  Morales was certain that at least one of the inmates involved in the illegal drug activity was aware of plaintiff's role in exposing the illegal drug activity.  See Tr. at 14-15.  Therefore, he felt threatened by the possibility of encountering those individuals at the NNHCF as well.  See Tr. 14.

On or about August 12, 2022, after hearing about the defendants' plans to send him to the NNHCF, Morales suffered a mental breakdown.  Tr. 5-6; see also Compl. ¶ 26.  He received a diagnosis of mental and emotional distress and was placed in isolation on a mental health unit where he remained for twelve days.  Tr. 6.  On August 24, 2022, Morales was released from the mental health unit and returned to quarantine in the CCU where he was locked down in his cell for 23 hours a day and deprived of his legal and personal property.  Tr. 7-8.  He then became ill with double lung pneumonia and had to be transferred back to isolation in the medical unit before returning to the CCU.  Id.  During his second stay in the medical unit, Morales asked a corrections officer why he was put in quarantine and was told that he was experiencing the "quarantine shuffle," which plaintiff later learned to mean that the NHDOC was "F-ing" with him.  Tr. 8-9.  Morales contends that defendants' conduct in moving him around and placing him in isolation and/or quarantine was motivated by their desire to retaliate against him for filing his motion to compel in Morales I and for filing his complaint in Morales II.  See Tr. 29-30.

During his confinement in the CCU, Morales initiated a grievance process by submitting an Inmate Request Slip to several of the defendants in which he complained about his inability to be housed safely at the NNHCF.[6]  See Tr. 8; Compl. ¶ 28.  Nevertheless, plaintiff was transferred to the NNHCF in early to mid-September 2022.  Tr. 8.  According to Morales, defendants indicated that their decision to transfer him there was based on his 39-B disciplinary infraction at the NHSP.  Compl. ¶ 23.  Again, however, Morales claims that this was merely a pretext, and that the real reason for his transfer was to punish him for filing and prosecuting his civil rights claims.  Compl. ¶¶ 23, 54; see also Tr. 27-28.  Upon his arrival at the NNHCF, plaintiff was placed under quarantine and held in lockdown for 23 hours a day.  Tr. 8.  Additionally, the NHDOC continued to withhold his legal files and paperwork, as well as some of his personal property.  Tr. 8-9.

### *Morales' Transfer Back to New Jersey*

Shortly after plaintiff's transfer to the NNHCF, the Morales I court issued an order directing the NHDOC to transport Morales to the courthouse in Concord, New Hampshire for an in-person hearing.  Compl. ¶¶ 31, 56.  Accordingly, Morales was transferred back to the NHSP on October 6, 2022.  Tr. 9.  Upon his arrival at the NHSP, the NHDOC placed Morales under quarantine and confined him in the SHU where he was held in lockdown for 23 hours a day.  Id.  Sometime thereafter, Morales' sister received calls from New Jersey parole and Donna Sweeney, Morales' coordinator in the New Jersey ICC office, informing her that the NHDOC wanted to send plaintiff back to New Jersey.  Tr. 9.  It is undisputed that defendants' justification for their decision was that plaintiff could not be housed safely at the NNHCF and could no longer be housed at the

---

[6] Morales testified that he submitted the Inmate Request Slip to defendants James Azarra, the then-Chief of Investigations for the NHSP, Michelle Edmark, the Warden of the NHSP, and Sarah Provencher, the then-Deputy Warden of the NHSP.  Tr. 8.

NHSP due to his disciplinary infraction.  Compl. ¶ 33.  Morales disputes the veracity of this claim. He contends that he never posed a security risk and that defendants were using the security issue as an excuse to punish him for filing the motion to compel in <u>Morales I</u>.  <u>See</u> Tr. 9-11, 23, 31.

On October 20, 2022, Morales was transported to court for a hearing in <u>Morales I</u>.  Compl. ¶ 35.  <u>See also</u> <u>Morales I</u>, Case No. 1:17-cv-00234-SM-AJ at Doc. No. 130.  Because Morales had none of the relevant legal papers with him, the court continued the hearing to November 7, 2022. Compl. ¶ 35.  <u>See</u> <u>also</u> <u>Morales I</u> at Docket Entry dated 10/20/2022.  It also issued an order directing the Warden of the NHSP to transport plaintiff back to the court for the November 7, 2022 hearing.  <u>Morales I</u> at Doc. No. 132.  However, on or about November 3, 2022, before that hearing took place, Morales was transferred back to New Jersey and placed in a New Jersey prison.  Compl. ¶ 36; Tr. 10-11.

Morales claims that he is presently incarcerated in New Jersey's Northern State Prison ("NJSP"), a maximum-security prison that largely houses violent offenders and gang-affiliated inmates, and is "totally out of control[.]"  Compl. ¶¶ 37-38; Tr. 12-13.  According to plaintiff, fights occur on a daily basis and interfere with everything from educational programs to religious worship.  Tr. 13.  Moreover, Morales claims that "[c]ompared to NHSP, [his] freedom and conditions of confinement have drastically been restricted."  Compl. ¶ 39.  Specifically, Morales claims that inmates at NJSP "are regularly locked down with little to no out-of-cell freedom[.]" <u>Id.</u> ¶ 38.  <u>See</u> <u>also</u> Tr. 36.  They must eat in their cells during lockdowns; have few, if any, opportunities to work, receive wages, or participate in educational programs or sports; and have limited access to telephones or other means of communication.  Compl. ¶ 38.  <u>See also</u> Tr. 36-37. Additionally, it can take up to a month to access to the law library, and Morales often must pay for an outside assistant to type up his legal documents and file them with the court.  Tr. 12-13.  In

contrast, Morales claims that during his confinement in the NHSP, he "was never locked in his cell" and was only locked in his pod between 9:00 p.m. and 5:00 a.m. each day.  Compl. ¶ 40.  He also claims that prisoners at the NHSP have ample opportunities to work and receive wages, and to participate in educational programs, sports, fitness, Hobbycraft and religious activities.  Id.  See also Tr. 37.  Furthermore, Morales contends that prisoners housed at the NHSP eat in a common dining hall and have access to electronic tablets that can be used for television, email, video games and other activities.  Compl. ¶ 40.  See also Tr. 37.  In short, Morales claims that the conditions of his confinement were far better in New Hampshire than they are in New Jersey, and he seeks return to the more favorable conditions available at the NHSP.

## LEGAL STANDARD

Morales moves for a preliminary injunction "compelling Defendants to make every effort to return Plaintiff to the [NHSP], and prohibiting Defendants from interfering with Plaintiff's constitutional rights and/or from retaliating against Plaintiff for petitioning the court for relief, including but not limited to, preventing Defendants from transferring Plaintiff out of NHSP" while this action is ongoing.  Doc. No. 2 at 10.  "A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right."  Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011)).  In determining whether to grant a preliminary injunction, the district court must weigh the following four factors: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs and (4) the effect, if any, on the public interest."  Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting Jean v. Mass. State

Police, 492 F.3d 24, 26-27 (1st Cir. 2007)).  "The party seeking the preliminary injunction" – in this case, Morales – "bears the burden of establishing that these four factors weigh in its favor." Esso Standard Oil. Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

The four factors "are not of equal prominence in the preliminary injunction calculus." Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020).  "The most important is whether the movant has demonstrated a likelihood of success on the merits – an element that [the First Circuit has] described as the 'sine qua non' of the preliminary injunction inquiry."  Id. (quoting Ryan v. ICE, 974 F.3d 9, 18 (1st Cir. 2020)).  "If the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence."  Akebia, 976 F.3d at 92. Consequently, the court "need not address the other elements of the preliminary injunction framework" where a plaintiff "fail[s] to carry its burden of showing that it is likely to succeed on the merits of its claims[.]"  Id. at 100.

Morales' burden of demonstrating his entitlement to relief is more stringent here because he does not seek "a traditional, prohibitory preliminary injunction, but instead asks for a mandatory preliminary injunction, which requires affirmative action by the non-moving party in advance of trial[.]"  Braintree Labs., Inc. v. Citigroup Global Markets Inc., 622 F.3d 36, 40-41 (1st Cir. 2010). "Because a mandatory preliminary injunction alters rather than preserves the status quo, it 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'"[7]  Id. at 41 (quoting Mass. Coal. of Citizens with Disabilities v. Civil Def.

---

[7] The "status quo" is "determined by looking at the last uncontested status which preceded the pending controversy."  Braintree Labs., Inc., 622 F.3d at 41 n.5 (internal quotations and citation omitted).  At the time he filed his complaint in this action on December 4, 2023, Morales was confined in New Jersey.  Compl. ¶ 37.  Therefore, the issuance of Morales' proposed preliminary injunction would alter the status quo.

Agency, 649 F.2d 71, 76 n.7 (1st Cir. 1981)).  Moreover, "[b]ecause [mandatory] injunctions are disfavor[ed], the moving party must make an even stronger showing of entitlement to relief than is typically required."  Thomas v. Warden, Fed. Corr. Inst., Berlin, N.H., 596 F. Supp. 3d 331, 337 (D.N.H. 2022) (internal quotation marks omitted) (second and third alterations in original) (quoting La Simple Co., Ltd. V. SLP Enters., LLC, Civil No. 21-10058-LTS, 2021 WL 1648762, at *4 (D. Mass. Apr. 27, 2021) (Sorokin, J.)).  Nevertheless, the question of whether a preliminary injunction is warranted "should still be measured according to the same four-factor test, as the focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo."  Braintree Labs, Inc., 622 F.3d at 41 (quotations, punctuation and citations omitted).

## DISCUSSION

Morales argues that he is entitled to a preliminary injunction under the applicable four-part test.  Doc. No. 2 at 5-10.  Defendants contend, however, that Morales' motion "is fatally flawed for two overarching reasons."  Doc. No. 19 at 2.  First, defendants argue that Morales cannot prevail on his motion because the court "cannot award the relief which Mr. Morales seeks."  Id. Second, defendants contend that the motion must be denied because all four of the factors applicable to the court's analysis weigh against the issuance of a preliminary injunction.  Id. Although defendants have not shown that the court lacks authority to grant the proposed relief, this court concludes that the motion must be denied because Morales fails to demonstrate a likelihood of success on the merits of his retaliation claim.

## I.    The Court's Ability to Grant a Preliminary Injunction

### A.  Nature of Morales' claim

The threshold issue raised by the parties' arguments is whether this court has the ability to grant the proposed relief.  Defendants argue, as an initial matter, that the factual circumstances

giving rise to this matter do not justify a preliminary injunction because "the Complaint alleges that Defendants violated Mr. Morales's right to access the courts, which is not at all impeded by his incarceration in New Jersey[,]" and because "[r]equiring his return to New Hampshire (or, at least requiring the Department to request his return to New Hampshire) far exceeds that which would be necessary to guarantee Mr. Morales access to the courts." Id. at 2-3.  This argument reflects a misunderstanding of Morales' claim against defendants.  As described in detail in a recent Report and Recommendation on Defendants' Motion to Dismiss (Doc. No. 33), Morales does not claim that defendants violated his constitutional rights by depriving him of access to the courts.  Rather, he claims that defendants violated his First Amendment right to access the courts without facing retaliation when they transferred him to allegedly more restrictive and dangerous conditions of confinement in retaliation for filing the two lawsuits against the NHDOC and its employees.

"[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Starr v. Moore, No. 09-cv-440-JL, 2010 WL 3002107, at *8 (D.N.H. July 27, 2010) (McCafferty, J.) (alteration in original) (quoting Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003)).  Under the First Amendment, "[p]rison officials may not punish an inmate because he exercises his constitutional right of access to the courts." Sisneros v. Nix, 95 F.3d 749, 751 (8th Cir. 1996) ("Sisneros I"); see also Ferranti v. Moran, 618 F.2d 888, 891 (1st Cir. 1980) (describing First Circuit's effort "to preclude or redress any attempts on the part of prison officials to punish or deter an inmate's exercise of his right of access" to the courts).  In the instant case, Morales claims that defendants punished him for engaging in litigation against them.  Therefore, defendants' assertion that Morales' transfer to New Jersey does not interfere

with his First Amendment rights, and therefore cannot justify the extraordinary relief of a preliminary injunction, is insufficient to support the denial of plaintiff's motion.

    B.  Defendants' reliance on New Hampshire state law

Defendants also argue that New Hampshire law precludes this court from granting a mandatory injunction. Specifically, defendants argue in relevant part as follows:

> The New Hampshire Supreme Court has explained that there is "no substantial distinction between mandamus and a mandatory injunction directing the performance of official public duties." *Guy J. v. Commissioner, N.H. Dep't of Educ.*, 131 N.H. 742, 747 (1989). A writ of mandamus (whether styled as such or styled as affirmative injunctive relief as it is in this case) may only issue to compel government officials to take ministerial actions, not discretionary action. *Rockhouse Mt. Property Owners Ass'n v. Conway*, 127 N.H. 593, 602 (1986) (citing *Guarracino v. Beaudry*, 118 N.H. 435, 437-38 (1978)). The harm which Mr. Morales seeks to remedy in his Motion is strictly the product of the [NHDOC's] discretionary act to return Mr. Morales to New Jersey when it decided it could not safely house him in New Hampshire.

Doc. No. 19 at 3-4. Accordingly, defendants maintain that under state law, the court cannot require New Jersey to release Morales or compel defendants to confine him in New Hampshire. Id. at 4.

This argument is also unpersuasive. As an initial matter, defendants have not shown that New Hampshire state law applies in this context. Here, plaintiff's sole claim alleges violations of his federal constitutional rights and the standard governing plaintiff's motion arises under federal law. At least one federal court has determined, after applying the federal standard governing motions for injunctive relief, that an injunction like the one Morales seeks is appropriate where the receiving state returns a prisoner to the sending state in retaliation for the prisoner's exercise of his First Amendment rights. See Sisneros v. Nix, 884 F. Supp. 1313, 1347-52 (S.D. Iowa 1995) ("Sisneros II") (concluding that injunction directing defendant prison officials in receiving state to "exercise all available efforts to secure [plaintiff's] return" to prison in receiving state was appropriate under federal law to remedy plaintiff's return to sending state in retaliation for

pursuing inmate grievances and filing suit against prison officials in receiving state), aff'd in part, reversed in part, 95 F.3d 749 (8th Cir. 1996).[8]  Defendants have not cited any authority showing that state law should preclude a similar analysis here.

Even assuming its applicability, New Hampshire law expressly authorizes courts to issue orders overturning "the result of the discretionary performance of an official function when an official exercises his discretion arbitrarily or in bad faith."  Guarracino, 118 N.H. at 437.   Here, Morales claims that defendants acted with an unlawful intent to cause him harm by transferring him in retaliation for exercising his First Amendment right to access the courts.   Thus, he effectively claims that defendants acted in bad faith.  See Marbucco Corp. v Suffolk Constr. Co., Inc., 165 F.3d 103, 106 (1st Cir. 1999) (describing New Hampshire Supreme Court's definition of "bad faith" as "an 'intentional disregard of a duty or intent to injure'" (quoting Murphy v. Fin. Dev. Corp., 126 N.H. 536, 541-42 (1985))).   For this reason as well, defendants have not shown that state law precludes a preliminary injunction under the circumstances of this case.

## II.   <u>Likelihood of Success on the Merits</u>

Next, defendants argue that Morales is not likely to succeed on the merits of his case, so the motion for a preliminary injunction must be denied.  See, e.g., Doc. No. 23 at 2-4.  Specifically,

---

[8] Defendants argue that on appeal, the Eighth Circuit Court of Appeals overturned the District Court of Iowa's decision in Sisneros II, thereby "nullifying the trial court's injunction."  Doc. No. 32 at 13.  This is not an accurate description of the Eighth Circuit's decision.  The Eighth Circuit reversed the District Court's decision to the extent it granted summary judgment to Sisneros on his damage claim for retaliatory transfer.  See Sisneros I, 95 F.3d at 751.  Specifically, the Eighth Circuit found that Sisneros was not entitled to summary judgment because he failed to satisfy his burden of proving that his transfer would not have occurred "but for" defendants' unconstitutional, retaliatory motive.  Id. at 752.  With respect to the injunction, the Eighth Circuit explained as follows: "after Arizona transferred Sisneros to a third State, at his request the district court dissolved its injunction requiring defendants 'to use all available efforts to secure Sisneros' return to Iowa.'"  Id. at 751 n.2.  Therefore, the Eighth Circuit had no occasion to consider the injunction on appeal and the district court's analysis of that issue remains good law.

defendants contend that Morales waived his ability to challenge his return to New Jersey by signing the Inmate Waiver, and therefore, he cannot demonstrate that his transfer was retaliatory.  See id. Although this court disagrees with defendants' waiver argument, it nevertheless finds that Morales does not demonstrate a likelihood of success on the merits.

"To demonstrate likelihood of success on the merits, [a plaintiff] must show 'more than mere possibility' of success – rather, [he] must establish a 'strong likelihood' that [he] will ultimately prevail."  Sindicato Puertorriqueño de Trabajadores, 699 F.3d at 10 (quoting Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).  To prevail on a claim for retaliatory transfer in violation of the First Amendment, "a prisoner must prove that (1) he engaged in conduct protected by the First Amendment, (2) adverse action was taken against him that was sufficient to chill his exercise of protected conduct, and (3) there is a causal connection between his protected conduct and the adverse action."[9]  Smith v. Warden, N.H. State Prison, No. 05-cv-374-JD, 2008 WL 282263, at *5 (D.N.H. Jan. 31, 2008).   The record in the instant case demonstrates, and defendants do not dispute, that Morales engaged in conduct protected by the First Amendment by filing and pursuing litigation against the NHDOC and its employees.  See Starr v. Moore, No. 09-cv-440-JL, 2010 WL 3002107, at *9 (D.N.H. Jul. 27, 2010) (finding that plaintiff's "judicial litigation activities are protected by the First Amendment as an exercise of his right to petition the

---

[9] In their Surreply, defendants argue that Morales cannot demonstrate a likelihood of success on the merits of his claim because prisoners have no liberty interest or other constitutional right to be housed in a particular prison or in a particular state.  See Doc. No. 23 at 2.  As described above, however, Morales is not claiming that defendants violated his constitutional rights by refusing to house him in the prison of his choice.  He is claiming that defendants punished him for exercising his constitutional right of access to the courts by transferring him to more restrictive and dangerous conditions of confinement.  Accordingly, "the fact that a prisoner does not have a constitutional right to a particular prison placement does not doom [Morales'] case" and does not compel the denial of his motion for a preliminary injunction.  Holleman v. Zatecky, 951 F.3d 873, 878 (7th Cir. 2020).

government to redress grievances"); Price v. Wall, 464 F. Supp. 2d 90, 96-97 (D.R.I. 2006) (finding that plaintiff satisfied the first element of his First Amendment retaliation claim where the undisputed facts showed that he filed suit in state court against the Rhode Island Department of Corrections).  Therefore, the question whether Morales is entitled to a preliminary injunction depends on his ability to demonstrate a strong likelihood that he will ultimately prevail on the second and third elements of his retaliation claim.

   A.  Presence of an adverse action

   To demonstrate that an action is "adverse" for purposes of a retaliation claim, Morales must show that defendants "subjected him to conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her Constitutional rights."  Starr, 2010 WL 3002107, at *9 (quotations and citation omitted).  "This is an objective standard; it does not hinge on the personal experience of the plaintiff."  Holleman v. Zatecky, 951 F.3d 873, 880 (7th Cir. 2020). "Even if a particular inmate is not chilled in his expression, a claim for retaliation may still arise if the retaliatory behavior alleged is objectively sufficient and onerous to deter an ordinary person from exercising his rights."  Starr, 2010 WL 3002107, at *9.

   "In the prison context, actions comparable to a transfer to segregation or an involuntary transfer to an out of state prison can generally be considered 'adverse' to an inmate."  Price, 464 F. Supp. 2d at 97.  See also Smith v. Warden, N.H. State Prison, No. Civ. 05-CV-374-JD, 2006 WL 1425063, at *7 (D.N.H. Apr. 25, 2006) (approving the magistrate judge's report and recommendation, which found on preliminary review, that prisoner stated viable First Amendment retaliation claims against prison officials where he alleged that "defendants transferred him to Texas in retaliation for his prosecution of claims against NHSP employees").  Similarly, a transfer that "place[s] significantly more restrictions" on a prisoner's freedom or subjects the prisoner to a

"dangerous environment" may be sufficient to establish an adverse action.  Holleman, 951 F.3d at 881-82.  In addition, conduct involving the "intentional destruction or confiscation of personal property and legal materials without cause is an adverse action."  Cook v. Maloney, No. 03-12138-RWZ, 2010 WL 1381859, at *3 (D. Mass. Mar. 30, 2010).

The evidence presented in this case satisfies the applicable standard.  The record shows that between July 2022 and September 2022, Morales endured involuntary transfers to the SHU and the CCU where he was isolated, placed under quarantine, held in lockdown for 23 hours a day, and deprived of his legal and personal property. See Tr. 5-7.  It also shows that Morales was transferred to the NNHCF despite obvious risks to his personal safety.  See Tr. 8.  Upon his arrival at the NNHCF, plaintiff was placed under quarantine and held in lockdown for 23 hours a day.  Id. Moreover, the NHDOC continued to withhold his legal files and paperwork, as well as some of his personal property.  Id.  Under the relevant case law, these transfers easily fit within the definition of an adverse action.

During the evidentiary hearing on the motion for a preliminary injunction, Morales provided testimony comparing the conditions of his confinement in New Jersey to those he experienced at the NHSP.  As described above, Morales described the conditions in New Jersey as far more restrictive than those in New Hampshire.  He also described the NJSP as far more dangerous and "out of control" than the NHSP.  Tr. 12-13.  This testimony, which is unrebutted, is sufficient to demonstrate that defendants' decision to return Morales to New Jersey constitutes an adverse action for purposes of a retaliatory transfer claim.  See Holleman, 951 F.3d at 882 (indicating that "relocation to a much more restrictive or dangerous environment" is "likely to deter a person of ordinary firmness from continuing to engage in protected conduct.").  Therefore,

Morales has demonstrated that he will likely prevail on the adverse action prong of his retaliation claim.

B. <u>Effect of Morales' Inmate Waiver</u>

Defendants nevertheless contend that returning Morales to New Jersey does not constitute an adverse action because Morales is bound by the terms of the Inmate Waiver, in which he expressly agreed to "waive extradition" and "return without protest to the State of New Jersey whenever such return is initiated by either State."   <u>See</u> Doc. No. 32 at 1-2, 7; Def. Ex. A. Specifically, defendants argue that the Inmate Waiver is a binding contract under New Hampshire law[10] and that the terms of the contract undermine any showing of an adverse action against Morales because

> [a]n inmate of ordinary firmness, having violated NH-DOC prison rules, having no independent right to be incarcerated in New Hampshire, and having contractually waived protest of return to his or her original place of incarceration, could not reasonably be deterred from exercising the right to petition the government or access the courts.

Doc. No. 32 at 3-4, 7.   Accordingly, defendants request that the court enforce the terms and conditions of the Inmate Waiver and deny plaintiff's motion for a preliminary injunction.   <u>See</u> <u>id.</u> at 2-5.

Morales does not dispute defendants' assertion that the Inmate Waiver is a binding contract.   However, he argues that defendants lack standing to enforce the Inmate Waiver because

---

[10] The record demonstrates that Morales entered into the Inmate Waiver with the NJDOC while he was incarcerated in New Jersey, and that New Hampshire was not a party to the agreement. Accordingly, it is far from clear that New Hampshire law applies to the interpretation and enforcement of the Inmate Waiver.   Defendants assert that "[t]here is no appreciable difference between New Jersey and New Hampshire contract law."   Doc. No. 32 at 3 n.1.   For purposes of the instant motion, this court will assume, without deciding, that there is no material difference and that this court may rely on New Hampshire law.

New Hampshire is not a party to the agreement.[11]   Doc. No. 30 at 4.   Additionally, Morales

concedes that while he waived extradition, nothing in the Inmate Waiver can be construed as a

waiver of his right to hold defendants liable for constitutional violations.   Id.   Therefore, he asserts

that the Inmate Waiver does not defeat his motion for a preliminary injunction.   This court agrees

that Morales did not waive his right to challenge defendants' alleged violations of his constitutional

rights when he executed the Inmate Waiver, and that defendants' reliance on that agreement does

not warrant the denial of Morales' motion.[12]

It is undisputed that by signing the Inmate Waiver, Morales expressly agreed to "waive

extradition" and "return without protest to the State of New Jersey whenever such return is initiated

by either [New Hampshire or New Jersey]."   Def. Ex. A.   However, defendants have not shown

that the Inmate Waiver prevents Morales from challenging his return to New Jersey as

unconstitutional.   See Sisneros I, 95 F.3d at 752 (ruling that district court properly undertook to

determine whether decision to transfer prisoner back to sending state under the ICC was

---

[11] In his filings in support of the motion for a preliminary injunction, Morales questions the authenticity of the Inmate Waiver.  Doc. No. 30 at 2-3.  However, during the evidentiary hearing, Morales authenticated the Inmate Waiver, and this court admitted it into evidence as an exhibit.

[12] Given this court's determination that the Inmate Waiver does not defeat Morales' motion for a preliminary injunction because it does not constitute a waiver of plaintiff's right to challenge alleged violations of his constitutional rights, it is unnecessary to address Morales' argument that defendants lack standing to enforce the Inmate Waiver on the grounds that they are not parties to the agreement.  This court notes, however, that defendants would likely have difficulty establishing a right to enforce the Inmate Waiver based on their status as non-parties to the agreement, and the lack of any express language designating New Hampshire as a third-party beneficiary under the Inmate Waiver.   See Sunapee Difference, LLC v. State, 164 N.H. 778, 784 (2013) (describing "general rule that a non-party to a contract has no remedy for breach of the contract" (quoting Arlington Trust Co. v. Estate of Wood, 123 N.H. 765, 767 (1983))); Brooks v. Trustees of Dartmouth Coll., 161 N.H. 685, 698 (2011) ("[O]rdinarily a person's entitlement to sue to enforce a contract to which she's not a party must be expressed in the contract rather than implied." (alteration in original; quotations and citation omitted)).

unconstitutionally retaliatory even though language of ICC documents required sending state to "retake any inmate" upon request).   As defendants argue, "[i]t is well settled that an individual can waive his or her constitutional rights in both civil and criminal proceedings."   Wilkicki v. Brady, 882 F. Supp. 1227, 1231 (D.R.I. 1995), and cases cited.  See Tomasko v. Dubuc, 145 N.H. 169, 175-76 (2000) (noting that "[c]onstitutional rights can be waived" and ruling that plaintiff waived her right to travel under the New Hampshire Constitution when she entered into a stipulation that was incorporated into a final divorce decree).  However, there is no evidence that Morales did so.  In particular, there is no language in the Inmate Waiver addressing the issue of Morales' constitutional rights.  Nor have defendants pointed to any other facts showing that such a waiver occurred.

Even if this court were to assume that Morales' agreement to "waive extradition" and "return without protest to the State of New Jersey whenever such return is initiated by [New Hampshire or New Jersey]" could be construed as a waiver of plaintiff's constitutional rights, defendants have not shown that Morales understood the significance of his agreement.  In the criminal context, the Supreme Court has found that "a waiver of constitutional rights must be voluntary, knowing, and intelligent in order to be enforceable."  Wilkicki, 882 F. Supp. at 1231. Although "it has not been expressly held, this 'voluntary, knowing, and intelligent' standard has been applied by the Supreme Court to the evaluation of a waiver of constitutional rights in civil cases."  Id.  See also Tomasko, 145 N.H. at 176 (assuming, without deciding, that waiver of a constitutional right in a civil action must be "knowing, voluntary, and intelligent").

Here, there is no mention of constitutional rights in Morales' Inmate Waiver, and no other language that alerted Morales' to the possibility that he was forfeiting those rights when he entered into the agreement.  Additionally, defendants point to no other evidence showing that Morales had

any such awareness. Because no prisoner in plaintiff's position could have reasonably understood that he was waiving his constitutional rights when he signed the Inmate Waiver, there is no basis for finding such a waiver. Thus, contrary to defendants' argument, the Inmate Waiver does not warrant the denial of Morales' motion for a preliminary injunction.

    C.  <u>Existence of a causal connection between the protected conduct and the challenged transfers</u>

The next issue raised by the parties is whether Morales satisfied his burden of showing that he is likely to succeed in establishing a causal connection between his protected conduct in filing and prosecuting his two civil lawsuits against the NHDOC and his subsequent transfers. Morales maintains there can be little question that defendants' actions were motivated by retaliation. Doc. No. 2 at 7. Defendants argue, however, that plaintiff relies on nothing more than speculation, which is far from adequate to prevail on his motion for a preliminary injunction. Doc. No. 32 at 8. Defendants further argue that the motion must be denied because, in light of Morales' confession that he violated a prison disciplinary rule, plaintiff cannot establish that "but-for" his litigation against the NHDOC, defendants would not have transferred him. <u>See</u> <u>id.</u> at 12. This court finds that Morales failed to present sufficient evidence to establish a strong likelihood that he will prevail on this issue. Therefore, it recommends that his motion be denied.

In a retaliation case, "inmates 'face a substantial burden' to show that retaliation is 'the actual motivating factor' for the adverse action." <u>Horstkotte v. Comm'r, N.H. Dep't of Corr.</u>, No. 08-cv-285-JL, 2010 WL 1416790, at *5 (D.N.H. Apr. 2, 2010) (quoting <u>McDonald v. Hall</u>, 610 F.2d 16, 18 (1st Cir. 1979)). An inmate claiming retaliatory transfer "must prove that he would not have been transferred 'but for'" defendants' retaliatory motive. <u>Layne v. Vinzant</u>, 657 F.2d 468, 475 (1st Cir. 1981) (quoting <u>McDonald</u>, 610 F.2d at 18-19)). <u>See also</u> <u>Sisneros I</u>, 95 F.3d at 752 ("In a retaliatory transfer case, 'the burden is on the prisoner to prove that but for an

unconstitutional, retaliatory motive the transfer would not have occurred.'" (quoting <u>Goff v. Burton</u>, 7 F.3d 734, 738 (8th Cir. 1993)). If a transfer is motivated "by rational penological concerns" rather than the fact that plaintiff engaged in protected conduct, it cannot be deemed retaliatory. <u>Sisneros I</u>, 95 F.3d at 752-53. <u>See also</u> <u>Horstkotte</u>, 2010 WL 1416790, at **5-6 (ruling that causation element of plaintiff's retaliation claim failed as a matter of law where defendants provided a legitimate explanation for their actions).

Defendants argue that they had rational penological reasons for Morales' transfers, both within the New Hampshire Prison system and ultimately to New Jersey. <u>See</u> Doc. No. 32 at 9. The record supports this argument.

It is undisputed that on July 31, 2022, Morales was removed from his housing unit and placed on PAR for violating a prison disciplinary rule by giving a birthday card to a female staff member. <u>See</u> Compl. ¶¶ 19-21; Tr. 5. It is also undisputed that he was confined in the SHU after pleading guilty to the disciplinary charge. Tr. 5. Although Morales disputes the severity of his disciplinary offense, these facts are sufficient to show that defendants considered Morales to present a security risk to staff at the NHSP. They also support an inference that defendants continued to confine Morales in restrictive housing, including the SHU and the CCU, for purposes of maintaining security pending his transfer to the NNHCF. Indeed, there is no dispute that defendants told plaintiff that the reason for his transfer to the NNHCF was that Morales "was overly familiar with a female staff member." Compl. ¶ 23. Therefore, the evidence supports a non-retaliatory reason for Morales' intra-state transfers.

The record also provides support for defendants' assertion that they had a non-retaliatory reason for Morales' interstate transfer. As Morales described in his Complaint, defendants explained that they decided to return plaintiff to New Jersey because he could no longer be housed

safely at the NNHCF and could no longer be confined at the NHSP due to the security concerns arising from his disciplinary offense. Compl. ¶ 33. Therefore, defendants have proffered a legitimate penological basis for this transfer as well.

During the evidentiary hearing, Morales conceded that he has no direct evidence of a retaliatory motive and must rely on circumstantial evidence to show that defendants' explanation for their conduct was pretextual. See Tr. 5-9, 29-33 (describing, as evidence of defendants' retaliatory motive, the fact that Morales' transfers began shortly after he filed a motion to compel in Morales I and initiated Morales II; the number of transfers that occurred without a specific explanation; Morales' confinement in the SHU following his disciplinary charge, even though segregation was not included as part of his sanction; the statement from a corrections officer describing Morales' placements in quarantine as the "quarantine shuffle," which Morales later learned to mean that the NHDOC was "F-ing" with him; defendants' decision to transfer Morales to the NNHCF despite their knowledge of the threat it posed to his safety; defendants' withholding of Morales' property and legal documents during his confinement in the CCU and the NNHCF; and Donna Sweeney's discussion with Morales' sister in which Ms. Sweeney allegedly suggested that there was no justification for the decision to return Morales to New Jersey). "Because it is difficult to prove a retaliatory state of mind, the plaintiff can introduce circumstantial evidence to establish liability if it supports a reasonable inference of retaliation[,]" Horstkotte, 2010 WL 1416790, at *5. However, at this stage in the proceedings, Morales' reliance on such evidence is insufficient to establish a strong likelihood of success on the issue of retaliatory intent.[13] Under

---

[13] Although Morales' reliance on circumstantial evidence was sufficient to withstand defendants' motion to dismiss, Morales is not entitled to a preliminary injunction in the absence of "a strong likelihood that [he] will ultimately prevail" on the issue of retaliatory intent. Sindicato Puertorriqueño de Trabajadores, 699 F.3d at 10 (emphasis added; quotations and citations omitted).

the controlling precedent, courts are required to afford "significant deference" to prison officials' non-retaliatory justification for their transfer decisions.  Holleman, 951 F.3d at 880.  Although Morales may ultimately prevail in showing that defendants' justification for his transfers were false, and that the real reason for their conduct was to punish him for his litigation against the NHDOC, the record falls short of overcoming the deference owed to defendants or demonstrating that "the exigencies of the situation" support the drastic remedy of a preliminary injunction.  See Braintree Labs., Inc., 622 F.3d at 41.

Morales challenges defendants' justification for their conduct on several specific grounds. He argues that he resided in New Hampshire "for almost 14 years without incident[,]" and that during those years, he was found guilty of several minor disciplinary offenses, but was never transferred or threatened with transfer until after he filed Morales II.  Doc. No. 21 at 3-4.  He also argues that under PPD 5.25, which was in effect at the time of his disciplinary violation, "transfer and/or placement in segregation [was] not a sanction available as a punishment for [a 39B] violation."[14]  Id. at 4.  Additionally, Morales notes that defendants' decision to release him from segregation and return him to general population for a period of time after he pleaded guilty to the 39B violation is inconsistent with their claim that he presented a safety risk.  See id. at 4-5. Accordingly, he maintains that their stated reason for his transfers are not credible.  See id. at 5.

These arguments are insufficient to "establish a strong likelihood that [Morales] will ultimately prevail" rather than a "mere possibility of success" on the issue of defendants' motivation.  Sindicato Puertorriqueño de Trabajadores, 699 F.3d at 10 (quotations and citation

---

[14] According to Morales, "discovery will show that transfer to another institution or out of state transfer is not the usual practice" for a 39B offense like the one to which he pleaded guilty.  Doc. No. 21 at 4.  At this stage, however, there is no evidentiary support for this argument.

omitted).  With respect to Morales' assertions regarding the 14 years preceding his 39B violation, there is no specific evidence describing his prior disciplinary history and no factual basis for comparing his prior treatment to defendants' conduct in this case.  Moreover, Morales' argument that PPD 5.25 prohibits the DOC from placing prisoners in segregation as a sanction for a 39B violation is inaccurate, as PPD 5.25 specifically provides that "B" infractions may be punished with up to five days of disciplinary segregation.  PPD 5.25, Att. 1 at 1.  Furthermore, the record shows that Morales spent only about two days in general population following his release from segregation, and that he was subsequently transferred to the CCU where he was placed under quarantine and held in lockdown for 23 hours a day.  See Tr. 5-7.  Therefore, the nature of his confinement arguably supports, rather than undermines, defendants' assessment of plaintiff as a threat to security.  Because Morales failed to demonstrate a likelihood of success on the merits of his retaliation claim, the remaining elements of the preliminary injunction analysis "are of little consequence."  Akebia Therapeutics, Inc., 976 F.3d at 92.  Therefore, this court recommends that Morales' motion be denied.

## CONCLUSION

For all the reasons detailed herein, this court recommends that Plaintiff's Motion for Preliminary Injunction (Doc. No. 2) be DENIED.  Any objections to this Report and Recommendation must be filed within fourteen (14) days of receipt of this notice.  The fourteen day period may be extended upon motion.  Failure to file any objection within the specified time waives the right to appeal the district court's Order.  See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).  Only those issues raised in the objection(s) to this Report and Recommendation "are subject to review in the district court" and any issues "not preserved by such objection are precluded on appeal."  Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d

554, 564 (1st Cir. 2010) (quoting Keating v. Sec'y of Health & Hum. Servs., 848 F.2d 271, 275

(1st Cir. 1988)).

_____
Talesha L. Saint-Marc
United States Magistrate Judge

September 17, 2024

cc:    Irvin Morales, pro se
       Counsel of record